The Tom Boy Gold Mines Co. et al. v. Green et al.

1. Practice—Parties—Presumptions.

Where upon motion of the defendant to an action a third party is by order of court made a party defendant and the record fails to disclose what showing was made in support of the motion, it will be presumed that the showing was sufficient to warrant the order.

2. Practice—Parties Defendant.

Section 16 of the code provides that when a complete determination of the controversy cannot be had without the presence of other parties the court shall order them to be brought in; and section 17 authorizes the court to make any person a party who has an interest in the subject of the action. In the latter case the application comes from the party himself but in the former it is the duty of the court to act when it receives the information, from whatever source the information may be derived. Where on motion of a party defendant, an order was made requiring another person to be made a party defendant, and the party afterwards voluntarily appeared and on her own motion became a party defendant, a formal application by the party was unnecessary, and a further order making her a party was superfluous, for the purpose of compliance with section 17.

3. Same—Jurisdiction.

Where a party not within the jurisdiction of the court was by order of court made a party defendant and required to appear and plead forthwith, that part of the order which required her to appear and plead forthwith was void and a failure to obey it involved no consequences.

4. Practice—Harmless Error.

Notwithstanding an order dismissing a party from the case and striking

her pleading from the files was technically erroneous, yet if assuming all the allegations of the pleading to be true the final result must still have been the same as it was, the error was harmless and would not warrant a disturbance.

5. PLEDGES—CONTRACTS—PARTIES.

Where stock of a corporation was pledged as security for a note under an agreement that the old certificates should be surrendered and new ones issued in the name of the pledgor, part of which should be retained by the pledgee, and the balance returned to the pledgor, but the pledgee returned the old certificates to the secretary of the corporation with instructions to issue new certificates in the names of other parties than the pledgor, and the corporation refused to follow the instructions and issued the new certificate in the name of the pledgor, the action of the corporation was not wrongful. The pledgee cannot complain that the stock took the direction he had agreed it should take when he received it. The new certificate vested the legal title to the stock in the pledgor and the fact that she deposited the certificate with the corporation for its protection in a contest between the pledgee and the corporation did not operate as a cancellation of the certificate and she was a proper and necessary party defendant in an action by the pledgee against the corporation to recover back the old certificates, or to compel an issuance of new ones in accordance with his instructions.

6. PLEDGES—TENDER OF PAYMENT.

Where stock of a corporation was pledged to secure a debt, an unconditional tender of payment of the debt by the pledgor operated to discharge the lien and terminate all right of the pledgee in the stock.

7. WRITTEN INSTRUMENT—ALTERATION.

The alteration of a written instrument in a material part, by the person claiming under it, avoids the instrument, and no cause of action can be predicated upon it, either in its original or later form.

8. PRACTICE—PLEADING—AMENDMENTS—DISCRETION OF COURT.

The allowance of amendments to pleadings is a matter within the discretion of the court, but it is not a discretion to be arbitrarily exercised, but should be exercised in the interest of justice. The refusal to allow an amendment to an answer setting up a material alteration of a written instrument, that formed the basis of the action, where the defendant was chargeable with no lack of diligence in making the application, was not in the interest of justice and was not the exercise of a sound discretion.

*Appeal from the District Court of Arapahoe County.*

THIS is a suit in equity. The record embraces separate appeals by different parties dissatisfied with the proceedings and

their result. They have severally assigned errors upon the decree, and upon certain orders made by the court in the progress of the cause. The merits of the controversy were not investigated, but the orders and the decree were based on the court's construction of the pleadings, on the relations which, upon the face of the papers, the court conceived the several appellants to sustain to the cause of action as stated in the complaint, and on its opinion of their rights in the subject-matter of the litigation, as set forth by themselves. The record is complicated as well as voluminous, and in order to an understanding of the questions which are to be determined, the pleadings and proceedings must be stated with considerable circumstantiality.

On the 25th day of July, 1895, Willard R. Green filed his complaint in the Arapahoe district court against Frank L. Underwood, W. L. Garey, and the Tom Boy Gold Mines Company, alleging that on the 22d day of May, 1895, the defendant Underwood made and delivered to the plaintiff his promissory note for $28,000, money loaned, payable on demand; that at the same time, the defendant was further indebted to the plaintiff in the sum of $33,805, evidenced by a note dated October 1, 1891, and also in some other amounts aggregating upwards of $9,000; that there was a dispute between the two as to whether the note for $33,805 represented a subsisting indebtedness, the plaintiff claiming, and the defendant denying that by reason of some other dealings between the parties, the indebtedness had been canceled, and that for the purpose of settling the dispute they had agreed in writing to submit it to arbitration, and had chosen the arbitrators; that on the 22d day of May, 1895, the plaintiff purchased from the defendant, 10,000 shares of the capital stock of the Tom Boy Gold Mines Company for $33,333.33⅓; that in consideration of the purchase, and of the loan for which the $28,000 note was given, and of the other indebtedness from Underwood to the plaintiff, Underwood transferred and delivered to the plaintiff the 10,000 shares so purchased, and for the purpose of securing the indebtedness from him to the plaintiff, trans-

ferred and delivered to the plaintiff 21,500 other shares of the capital stock of the Tom Boy Company; that of the stock so transferred 7,500 shares were in the name of Underwood on the books of the company, and were by him indorsed to the plaintiff, and 24,000 shares in the name of William Bayly, and by him indorsed in blank, and delivered by Underwood to the plaintiff; and that it was agreed, at the time, between Underwood and the plaintiff that the stock transferred as security should be retained by the plaintiff as well to secure the note for $33,805, if the arbitrators should determine that Underwood was liable for its payment, as to secure the other notes and indebtedness. The complaint further averred that the plaintiff caused the 7,500 shares of the stock which stood in the name of Underwood to be transferred to one H. P. Kelly, and forwarded the certificates representing the 24,000 shares which stood in the name of Bayly to the defendant Garey, the secretary of the company, with instructions to cancel those certificates, and issue in their stead certificates to Junia Porter Green for 10,000 shares, being the shares purchased by the plaintiff, to H. P. Kelly 10,000 shares, and to George R. Swallow 4,000 shares; that receiving, some days afterwards, an unsatisfactory reply, he telegraphed to Garey to return him the certificates; that Garey answered requesting permission to transfer them to Mrs. Underwood, the wife of Frank L. Underwood, and that the plaintiff immediately repeated his instruction to Garey to return him the certificates, receiving an answer that Underwood would shortly see the plaintiff; that Underwood accordingly met the plaintiff, and agreed with him to notify Garey to issue and forward certificates for the 24,000 shares to the plaintiff; that the plaintiff advised Garey of Underwood's agreement, but Garey answered that the certificates were not in his, but in Underwood's, control, and declined to issue new certificates until the old were returned to him; that the plaintiff afterwards saw Underwood, and the latter informed him that he had countermanded his direction to Garey, because he had concluded to pay the indebtedness of $28,000, and denied that the stock was transferred as

security for any other debt. It was further averred that Underwood was president of the Tom Boy Company; that the 24,000 shares included the 10,000 shares which the plaintiff had purchased, and of which he was the absolute owner, and that there was a collusion between Underwood, who was insolvent, and Garey, to transfer the stock, both that to which the plaintiff was entitled as owner, and that which he was entitled to hold as security, to some third person, and place it entirely beyond the reach of the plaintiff. The prayer was for an injunction restraining any disposition of the stock detrimental to the rights of the plaintiff, and for a decree that the stock, if it had not been canceled, be returned to him; or, if it had been canceled, that new certificates to the same amount be issued and delivered to him. An *ex parte* injunction was issued as prayed.

On the 9th day of October, 1895, the Tom Boy Gold Mines Company filed its answer to the complaint, putting in issue, either by direct denial, or by disclaimer of knowledge or information sufficient for the formation of a belief, all the averments of the complaint which were material to the cause of action, except those concerning the forwarding of the certificates of stock standing in the name of Bayly for transfer and reissue. At the same time the company filed its cross-complaint against the plaintiff, Willard R. Green, the defendant, Frank L. Underwood, and his wife Theodosia Underwood, which, after alleging the possession by the plaintiff of those certificates, their transmission by him to Garey for transfer, the refusal of Underwood as president of the company to permit their transfer in accordance with Green's directions, and giving on information and belief some account of the disputes between Underwood and Green concerning the amount of the indebtedness from the former to the latter, and of the purpose for which the stock was pledged to Green, averred that Theodosia Underwood claimed to be entitled to the same stock; that Green was threatening suit against the company to recover the market value of the stock on account of the refusal of Garey to transfer it; that Theodosia Underwood

was a nonresident, and without property in this state subject
to execution; that the property of Green and Frank L. Under-
wood consisted of money, shares of stock, and other like
things, easily removed and concealed; that the defendant
was in danger of being harassed by reason of the hostile
claims of the parties to the stock, and could not with security
recognize either as owning it. The cross-complaint prayed
that Theodosia Underwood might be made a party to the
suit, and that Frank L. Underwood, Willard R. Green, and
Theodosia Underwood, be ordered to interplead and adjust
their claims as between themselves, and offered to issue cer-
tificates of the stock to whomsoever the court should award it.

On the 25th day of October, 1895, Frank L. Underwood
filed his answer to the complaint, admitting the execution of
the note for $28,000 to the plaintiff; denying that its con-
sideration was money loaned to him, but averring that it
was for money borrowed for the use and benefit of Theodosia
Underwood, as the plaintiff well knew; denying that he was
indebted to the plaintiff in any other sum; admitting the
purchase from him by Green of 10,000 shares of the capital
stock of the Tom Boy Company for $33,333.33⅓; admit-
ting that 24,000 shares stood in the name of William Bayly
on the books of the company, but denying that he ever agreed
with the plaintiff that this stock or any part of it should be
held by the plaintiff as security for any indebtedness except
that represented by the note for $28,000, or for any purpose
except to secure the payment of that note; admitting the
sending by Green of the 24,000 shares to Garey for transfer,
as in the complaint stated, and admitting that the communi-
cations between the plaintiff and Garey in relation to the
stock, were as alleged, but denying that he ever agreed to
direct Garey to issue certificates of the stock to the plaintiff,
except upon the condition that the plaintiff would accept
them as security for the payment of the $28,000 note only;
denying any purpose on his part to defraud the plaintiff;
and denying the allegations of the complaint on which the
demand for equitable relief was specifically based. This an-

swer further stated that on the 22d day of May, 1895, he borrowed from the plaintiff for the sole use and benefit of his wife, Theodosia Underwood, $28,000, and executed therefor his individual note; that about that time he purchased from William Bayly 24,000 shares of the capital stock of the Tom Boy Company, the certificates representing which were indorsed in blank by Bayly, and delivered this stock to Green as security for the payment of the note; that the certificates for the 24,000 shares were purchased for Theodosia, and paid for wholly with her means, and were delivered to the plaintiff upon his agreement to surrender them to the company, and cause new certificates of a like amount to be issued in the name of Theodosia, out of which he should receive 21,500 shares, and no more, to secure the payment of the note, which agreement was written on the face of the note before its execution; that it was also at the same time agreed between Underwood and the plaintiff, that in lieu of the former's note, the plaintiff should accept the note of Theodosia; that he, Underwood, afterwards learned that the plaintiff was claiming that the 24,000 shares were delivered to him as security not only for the $28,000, but for other alleged indebtedness, and, upon so learning, obtained possession of the stock, and surrendered it to the company, the president and secretary of which reissued it to Theodosia; that pursuant to the agreement between him and the plaintiff, his wife Theodosia made and delivered to the plaintiff her own note for the $28,000, which he took and retained; that she afterwards caused to be tendered to him the full amount of the note, principal and interest, and that she was at all times ready to pay the same whenever he would accept the money and release his alleged claim upon her stock. It was alleged further that of the 10,000 shares sold to the plaintiff, 7,500 were delivered, being those issued in the name of Underwood, and the written agreement of Underwood given to the plaintiff, and still held by him, for the issue of the remaining 2,500 by the proper officers of the company on demand.

On October 28, 1895, on motion of the plaintiff, the court ordered the Tom Boy Company to deliver immediately to him the 24,000 shares which, as alleged, were represented by three certificates numbered 14, 15 and 16, for 8,000 shares each, if uncanceled, or if canceled, to issue and deliver to him in lieu of the three certificates a new certificate for 24,000 shares. On November 2, 1895, the foregoing order was, on motion of Underwood, modified so as to require the company to deposit the three certificates in court, and also the certificate issued to Theodosia Underwood, which was numbered 114. On the 21st day of November, 1895, the court ordered the delivery by its clerk to the plaintiff of certificates 14, 15 and 16, for the purpose only of enabling him to vote them at the meetings of the company, the purpose for which they were delivered to be indorsed on the certificates severally. On September 16, 1896, upon motion of the Tom Boy Company, the court ordered that Theodosia Underwood be made a party defendant, and that she forthwith appear and plead; and on the 26th of the same month she entered her appearance to the action.

On December 2, 1896, the plaintiff moved the court to vacate the order making Theodosia Underwood a party; and on the same day, without any notice or knowledge of the motion, she filed her answer to the complaint of the plaintiff, and at the same time filed her cross-complaint.

Her answer proper does not require special notice, because all its important allegations are contained also in her cross-complaint. In the latter pleading we find the following averments of fact: Prior to the 22d day of May, 1895, the cross-complainant desired to complete the purchase of 24,000 shares of the capital stock of the Tom Boy Gold Mines Company, represented by stock certificates numbered 14, 15 and 16, for 8,000 shares each, standing in the name of William Bayly; and to enable her to do so it was necessary that she obtain, by loan or otherwise, $28,000, on or before that date. On that day, Frank L. Underwood, her husband, and her agent in the premises, and known by Willard R. Green to be such agent, borrowed from Green for her, in the state of Colorado,

$28,000. The loan was effected in the state of Colorado, and in her absence from the state, and was negotiated for the purpose of completing the purchase of the 24,000 shares of stock. At the time the money was borrowed, it was agreed between Mr. Underwood, as her agent, and Mr. Green, that Underwood should execute his individual note to Green for the amount, and secure it by a pledge of 21,500 shares of the Tom Boy stock, the note and stock to be held by Green until such time as she should execute her own note for the same amount to him, and secure it by the delivery to him of certificates issued in her name representing the 21,500 shares of stock, when the note given by Mr. Underwood should be canceled. At the time the money was borrowed the certificates were not of such denominations that 21,500 shares only could be delivered to Green, and therefore, the whole 24,000 shares were left with him upon his agreement with Mr. Underwood that he would send the several certificates to the secretary of the company in New York, for the purpose of having the stock reissued in her name, to the end that she might be able to comply with the agreement made for her by her agent. On the 10th day of August, 1895, the Tom Boy Company, at her request, canceled the certificates 14, 15 and 16, sent by Green, and in their stead issued to her a new certificate numbered 114 for the 24,000 shares. After the transaction between Underwood and Green, she made and delivered to Green her individual note for $28,000. She never delivered to Green the 21,500 shares to which he would have been entitled as security, because he had violated his agreement in directing the reissue of the stock to strangers, and in endeavoring to subject it to the payment of an indebtedness for which it was not pledged; but instead of so doing, she tendered to him, in lawful money of the United States, the full amount, principal and interest, of the note, which money he refused to receive. The value of the 24,000 shares was in excess of $200,000. For the purpose of protecting the company against any liability on account of its issue to her of certificate No. 114, she delivered that certificate to the

company, notifying it that she would hold it responsible for the redelivery of the certificate to her, and this certificate was, together with certificates 14, 15 and 16, deposited in court, in pursuance of the order made for that purpose, before she was made a party to the suit, and without her knowledge or consent. Mr. Underwood, in negotiating the loan in her behalf from Green, had authority to pledge the stock for the payment of the $28,000, but had no other or further authority in connection with it; and the fact and extent of his authority were known to Green at the time. The foregoing embraces all the averments of the cross-complaint which we regard as important. The prayer was for a decree adjudging the ownership and possession of the stock to the cross-complainant.

On the 21st day of December, 1896, Mrs. Underwood pleaded to the cross-complaint of the Tom Boy Company by an answer and cross-complaint. These pleadings are substantially the same as those filed by her to the complaint of the plaintiff, Green, and therefore do not require special notice.

On the 13th day of January, 1897, the motion of Green to vacate the order making Mrs. Underwood a party was taken up and sustained, and on the next day Green moved the court to strike from the files of the cause her answers and cross-complaints. On the 25th day of the same month the court gave judgment sustaining the motion, and striking those pleadings from the files. Mrs. Underwood appealed from that judgment, and her appeal is embraced in this record.

On the 6th day of March, 1897, Mr. Underwood applied to the court for an order permitting him to amend his answer, so as to show certain alterations in his note to Green for $28,000, made after its delivery to Green, and to make the answer conform to the facts discovered. The application was supported by Underwood's affidavit, in which he stated that from the time of the execution of the note he had no access to it; that prior to the filing of his answer he saw an affidavit of Clinton Reed, Green's attorney, which

contained what purported to be a copy of the note; that on
the 30th day of January, 1897, he received in New York a
small photograph of the note which he was informed was
made by order of the court about January 25, 1897, and
that on the 20th day of February following he obtained, at
the office of Reed, an inspection of the note. He stated
that alterations had been made in the note which changed
its effect, and that it was when he made his inspection of
the instrument on February 20, that he first became con-
vinced of the fact of its alteration. The alleged alterations
were specifically pointed out in the affidavit; but, as the affi-
davit referred the court to photographs of the note in its pos-
session, and as one of those photographs is before us, we shall
describe its appearance instead of following the language of
the affidavit. What the affidavit designates as the note is
a combination of promissory note and contract of pledge.
First, there is a promise to pay $28,000 on demand. Then
follow these words in print, which evidently have not been
disturbed: "Having deposited with the said Green as col-
lateral security for the payment of the foregoing note."
Succeeding these words is their complement in writing,
which upon its face is not the same as it was when it was
first written. It contains two words, "forty" and "fifteen,"
one written directly over the other, so that originally it was
either " *two hundred and forty thousand dollars* of the capi-
tal stock of the Tom Boy Gold Mines Co.," or " *two hun-
dred and fifteen thousand dollars* of the capital stock of the
Tom Boy Gold Mines Co." In the margin, at the left of
these words, are the figures and letter " 215 M," which the
affidavit charges were placed there after the execution and
delivery of the note. The remainder of the contract of
pledge incorporated into the note was made upon a printed
formula by filling up the blanks. Of the printed words the
following were at some time erased by drawing a line through
them, " *in case of failure*," and " *if recourse is had to the said
collaterals*," so that before erasure this part of the instru-
ment read as follows: " which I hereby authorize said Green

to sell, without notice, at public or private sale at the option of said Green, *in case of failure* to pay the foregoing note, applying the net proceeds to the payment of said note including interest, and accounting to me for the surplus, if any. In case of deficiency, I promise to pay to said Green the amount thereof forthwith, after such sale, with interest; and it is hereby agreed and understood that *if recourse is had to the said collaterals*, any excess of such collaterals may be applied to the payment of any other note or claim held by said Green against me." The affidavit further stated that the changes in the instrument were made without the knowledge or consent of Underwood, and after its delivery to Green. Accompanying the application were also the affidavits of David V. Burns and Charles H. Toll, attorneys of Underwood, and of a number of expert witnesses. The purport of the attorneys' statements was that before Underwood's answer was prepared he stated to them that the entire 24,000 shares, as represented by certificates 14, 15 and 16, were pledged to secure the payment of the note, and they averred that the answer as first drawn so alleged, but that Mr. Toll, having been furnished with a copy of the note contained in the affidavit of Mr. Reed, from which it appeared that only 21,500 shares were pledged, insisted that Underwood was mistaken, and persuaded him to consent to a change of his answer so as to conform to the note as shown in Reed's affidavit, although he still asserted an opinion that he was correct at first; and that afterwards, upon obtaining an inspection of the note, he satisfied them that he had not been mistaken, whereupon the motion for leave to amend was made. The experts stated that the note was not as it had been originally drawn. Their affidavits, for the most part, showed nothing but what can be seen on the face of the photograph; but they agree upon a statement which, in an investigation of the facts affecting the question of alteration, would be important, and that is that the figures and letter, " 215 M," were written upon an erased or mutilated surface. On the 9th day of March, 1897, the Tom Boy Company filed its motion in the cause for leave to amend its

answer and cross-complaint so as to make those pleadings conform to the facts alleged by Underwood concerning the alteration of the note, showing by affidavit that its first knowledge of those facts was derived from the affidavit of Underwood filed in support of his application to amend. Its proposed amendments were tendered with its motion. On the 15th day of March, 1897, both motions for leave to amend, namely, that of Underwood, and that of the Tom Boy Gold Mines Company, were by the court denied; and afterwards, on the 19th day of March, 1897, the court, on motion of the plaintiff, Green, rendered final judgment in his favor on the pleadings as they then stood, finding that he was entitled to the sole and unrestricted possession of the stock in controversy, ordering the erasure from the certificates of the indorsement theretofore made by order of the court limiting his right to use them, and adjudging their unqualified possession to him. From the judgment so rendered Underwood and the Tom Boy Gold Mines Company have each prosecuted an appeal to this court, and their several appeals are embraced in this record.

Mr. CHARLES H. TOLL, attorney for appellant Frank L. Underwood.

Mr. D. V. BURNS, attorney for appellant Theodosia I. Underwood.

Mr. C. J. HUGHES and Messrs. WELLS, TAYLOR & TAYLOR, attorneys for appellant The Tom Boy Gold Mines Co.

Mr. WILLARD TELLER and Mr. CLINTON REED, for appellees.

THOMSON, P. J., delivered the opinion of the court.

The theory of this case advanced by plaintiff's counsel is that it does not, and cannot, involve any question of title to the stock sought to be recovered; that the refusal of the com-

pany to regard the directions of Green in relation to the stock certificates, and its detention of the certificates after he had demanded their return, were wrongful; that upon simple proof of the facts concerning the transmission of the certificates to the company, and its conduct respecting them after receiving them, the plaintiff was entitled to be placed in the position he occupied before parting with their possession, either by the return to him of the same certificates, or the issue to him of new certificates to the same amount. Counsel say that Underwood and Garey were made parties defendant only because they were the officers of the company by whom the wrongful acts were committed; and they also say that as the acts of these officers were the acts of the company, the latter, in view of the facts, is not in a position to avoid a trial of the question of its own misconduct, and direct the litigation into an investigation of another and different question. Upon this theory, no parties other than those named in the complaint were either necessary or proper, and the amendments to their pleadings proposed by Underwood and the company, which if allowed, would introduce into the case matters foreign to its purpose, and outside of its possible issues, were not to be tolerated, and were rightly rejected.

The basis of the argument is a doctrine which, when applied to certain conditions of fact, is indisputable. One may obtain possession of property in such manner, and under such circumstances, that it would be contrary to the policy of the law, if not actually unjust, to permit him, while withholding the possession, to controvert the title of the person from whom he received it. But the distinctive features of each particular case are determinative of the general principle by which it shall be controlled; and to find whether, with reference to the case at bar, the position assumed by counsel is tenable, the disclosures made by the record must be examined.

The complaint sets forth the title of the plaintiff in the stock, its transmission by him for transfer, and his ineffectual demand for its return after the transfer was refused. If there were nothing in the case but a pledge of stock with the plain-

tiff, as security for a debt which remained unpaid, his rights
would not seem to admit of question. It may be that upon
a trial such would be found to be the exact situation. But
there was no trial, and the question is whether upon the sh)w-
ing which was made against the plaintiff, the court could do
justice between the parties without a trial. The answer of
Frank L. Underwood put in issue some important allegations
of the complaint, but owing to his attitude in respect to the
case, upon which we shall comment hereafter, and to the fact
that the averments of his answer are repeated in the plead-
ings of Theodosia Underwood, which were stricken out, we
do not think it necessary to devote much time to him, and
shall examine these averments, as they have been adopted by
her, when we come to a consideration of the rulings by which
she was dismissed from the case, and her pleadings stricken
out.

The Tom Boy Gold Mines Company, by its cross-complaint,
after averring that the stock was claimed by Theodosia Un-
derwood, prayed that she might be made a party to the suit,
to the end that the conflicting claims of herself and Green
might be litigated and adjusted, and the company relieved
from responsibility to either. We do not deem it necessary
to consider the questions raised by counsel concerning the
sufficiency of the cross-complaint as a bill of interpleader, or
as an application to make Mrs. Underwood a party defendant,
because no question upon its sufficiency was made below, and
because it was not in direct response to the prayer of the
cross-complaint that she was finally brought into the case.
Nearly a year after that pleading was filed, the Tom Boy
Company presented its motion for an order making her a
party. The motion was sustained, and she was made a de-
fendant, and ordered to appear and plead forthwith. What
the showing was in support of the motion, the record does
not advise us. But as the presumptions are in favor of the
regularity of the proceedings of courts, we must presume
that it was sufficient to warrant the order making her a party.
Afterwards the plaintiff moved to vacate the order on the

grounds, first, that the order was made at the request of the
Tom Boy Company; second, that Mrs. Underwood had failed
to plead in the cause in obedience to the order; third, that
she was not interested in the controversy; fourth, that she
had not sought to be made a party; and, fifth, that under the
issues the company had no right to make her a party. The
first and fourth grounds may be considered together. We
suppose their meaning is that third persons cannot be brought
into a suit as parties, except upon their own application; and
that the order bringing in Mrs. Underwood, having been made
at the instance of the Tom Boy Company, was irregular.
There are two code provisions on the subject of new parties.
Section 16 provides that when a complete determination of
the controversy cannot be had without the presence of other
parties, the court shall order them to be brought in; and sec-
tion 17 authorizes the court to make any person a party, upon
his own application, who has an interest in the subject of the
action. In the last case the motion comes from the party him-
self; while in the first, the information upon which the court
acts may come to it from some other source, and it is the duty
of the court to act when it receives the information, from
whatever source the information may be derived. *Allen* v.
*Tritch*, 5 Colo. 222. It was therefore no valid objection to
the order bringing Mrs. Underwood in that it was made at the
request of the Tom Boy Company. She became a party also
on her own motion, because she entered her appearance vol-
untarily. Even for the purpose of compliance with section 17,
a formal application by her was unnecessary, because an order
bringing her in had already been made, and no reason is per-
ceived why she was not entitled to avail herself of that. A
further order to the same purport would have been superflu-
ous. We see no irregularity in the manner in which she be-
came a party. The second ground is altogether untenable.
The order making Mrs. Underwood a party was not made at
her instance, and when it was made she was not within the
jurisdiction of the court. Until service of process upon her,
or her voluntary appearance, the court could bind her by no

order.   That portion of the order which required her to ap-
pear and plead forthwith was therefore void, and her failure
to obey it involved no consequences whatever.   The basis of
the third and fifth grounds of the motion is evidently the
theory of the case to which we have already adverted, and
which cannot be intelligibly or intelligently discussed in this
immediate connection.   If, however, it shall be found that
the theory is wrong, then there were no grounds whatever
for sustaining the motion, and the ruling was error.   And if
it was error to sustain this motion, the order striking out the
answers and cross-complaints was also erroneous, and for like
reasons.   But, notwithstanding the orders dismissing Mrs.
Underwood from the case, and striking out her pleadings,
may have been technically erroneous, yet if those pleadings
disclosed no reason why the plaintiff was not entitled to the
relief which he asked, so that, assuming their statements to
be all true, the final result must still have been the same that
it was, then the error was harmless, and would not warrant a
disturbance of the judgment.   It is therefore requisite that
we now examine her pleadings for the purpose of ascertain-
ing her relation to the subject-matter of the suit, as well as
testing the soundness of the theory on which the necessity of
her presence in court is denied.

The following is her version of the transactions affecting
the stock: She had taken steps to secure for herself this
identical stock, and required $28,000 to complete its pur-
chase.   She authorized her husband to negotiate a loan in
that amount for her.   As her agent, and in her behalf, he
borrowed the money from the plaintiff.   The plaintiff was
acquainted with the facts, and knew that the stock was hers,
and that Frank L. Underwood was merely her agent.   At
the time of the transaction, which took place in Colorado,
she was out of the state ; and her husband, to protect the
plaintiff, made his individual note for the amount, to be held
by the plaintiff until it could be replaced by hers.   The stock
had been issued to William Bayly, and had been indorsed
by him in blank, so that no further assignment was necessary,

and delivery was sufficient to pass . the title. It was then agreed between Mr. Underwood and the plaintiff that of this stock 21,500 shares should be held by the latter as security for the repayment of the loan, and that as the certificates were of such denominations that the stipulated number of shares could not be delivered, the whole 24,000 shares should be left with him, he agreeing to send the certificates to the office of the company in New York, and cause the stock to be reissued in her name, and receive from her 21,500 shares of the stock so issued, together with her own note for the amount of the loan, upon receipt of which, Mr. Underwood's note should be canceled. When the plaintiff sent the stock to the company, with instructions to reissue it in the name of third parties, the company at her request canceled the old certificates, and issued to her a new certificate, numbered 114, for the entire 24,000 shares. She sent the plaintiff her own note for $28,000, which he received and kept. She did not turn over to him the 21,500 shares which, by her agent, she had agreed to give him, because instead of ordering the reissue of the stock to her, as he had agreed to do, he ordered its issue to strangers; and because he was endeavoring to subject it to the payment of an indebtedness for which it was not pledged; but instead of delivering him the stock, she tendered him, in lawful money, the full amount of the loan, principal and interest, which he refused to receive.

Now upon the only hypothesis which, in the present condition of the case, and for the purposes of this decision, can be entertained, namely, that of the truth of the allegations of Mrs. Underwood's pleadings, when the company canceled the old certificates, and reissued the stock they represented, to her, it did exactly what the plaintiff had contracted it should do. It is true that his agreement was not with the company, and that the company, in issuing the stock, disobeyed his orders; but his orders were in violation of the contract of pledge, and a breach of the conditions upon which he held the stock; and a court of equity would hardly listen with satisfaction to his complaint, that without his intervention,

or even in opposition to his instructions, the stock took the very direction which he agreed it should take when he received it.   Under the circumstances which have been detailed, we do not think that the act of the company in issuing the stock to Mrs. Underwood was wrongful; at least, we feel safe in asserting, if the facts be according to her statements, it does not lie in the plaintiff's mouth to say that it was wrongful.   The issuance to Mrs. Underwood of the new certificate, upon the cancellation of the old certificates, invested her with the legal title to the stock.   This certificate she afterwards delivered to the company, for the purpose, as she says, of its protection in its contest with the plaintiff, at the same time notifying it that she would hold it responsible for the redelivery of the certificate to her.   The opinion of counsel seems to be that this act of hers in turning the certificate over to the company operated to cancel it; but from the limitation which she annexed to its delivery, we think an exactly opposite conclusion is to be drawn.   She parted with the possession, but not with the property.   The purpose was to relieve the company, in case the litigation should result adversely to it, from the embarrassment of having the certificate afloat, possibly in the hands of an innocent purchaser; but the certificate itself, although in the company's possession, was to remain hers, at least until her title should be extinguished by a valid judgment.   Having received this stock, her contract bound her to cause the certificate to be subdivided, and to deposit 21,500 shares with the plaintiff as security for the payment of her note, but instead of doing this she tendered the amount due.   The effect of the tender, if it was unconditional, was to discharge the lien, and terminate all right of the plaintiff in the stock.   Jones on Pledges, §§ 544, 545.

A number of questions arise upon Mrs. Underwood's answers and cross-complaints, by which the plaintiff's right to relief, as well as the liability of the company to the plaintiff, and its obligation to her, may be affected.   If the original transaction was with her, and if the issuance of stock certificate No. 114 was a carrying out of the contract which he

made with her, then if his right in the stock is still unimpaired, his remedy would seem to be against her to compel her to fulfill her contract with him by turning over to him the stipulated 21,500 shares. Whether his right to the possession of the stock has not been extinguished by tender of the amount for which it was pledged, is also an important question, directly presented by her pleadings. These questions cannot be determined in any proceeding to which she is not a party. Furthermore, if the old certificates were canceled, and in lieu of them certificate No. 114 issued to her, another difficulty arises in the way of treating this suit as a summary proceeding to compel the company to restore the *status quo*. She claims certificate 114 as her property. Before she was made a party, an order was entered against the company to deposit that certificate, together with the others, in court. We find no subsequent mention of it in the record, and it is ignored in the final decree. Presumably it is still in the custody of the court. But wherever it is, on its face it is the property of Mrs. Underwood, and it represents the same stock which prior to its issue was represented by the three canceled certificates. If these certificates can be galvanized into life by an order of the court, certificate 114 must be first gotten rid of; or if by reason of their cancellation it would be proper, in accordance with the plaintiff's prayer, to issue a new certificate to him for the same stock, before such new certificate could be validly issued, certificate 114 must be annulled, because it stands for that stock. The only other relief to which the plaintiff could in any event be entitled would be a decree for the assignment and delivery by Mrs. Underwood to him of certificate 114. But she cannot be compelled to submit either to the cancellation of that certificate, or to a judgment awarding it to the plaintiff, without an opportunity to be heard. We think a complete determination of the controversy as between the plaintiff and the Tom Boy Gold Mines Company cannot be had without the presence of Theodosia Underwood. Its liability in the proceeding is dependent on the result of an investigation of the matters alleged

in Mrs. Underwood's cross-complaint, and cannot be ascertained without an adjudication of those matters. And it is entitled to the judgment of the court, making such disposition of the stock in controversy, and of the conflicting claims in respect to it of Mrs. Underwood and the plaintiff, that upon its being adjudged to either, the company shall be free from responsibility to the other. Also, the pleadings of Mrs. Underwood disclosed in her such interest in the subject of the suit that she was entitled, in her own right, to become a party. She came in under an order already made, which rendered an application for the purpose by her unnecessary; and, as the law requires no unnecessary act, by her voluntary appearance she acquired the standing of a party. In our opinion, the orders dismissing her from the case, and striking out her pleadings, were erroneous, and should be vacated. The situation requires an investigation of the facts.

After Mrs. Underwood's answers and cross-complaints had been stricken out, applications were made by the defendants Frank L. Underwood and the Tom Boy Gold Mines Company to amend their respective answers so as to show that the note upon which the plaintiff's claim to the stock depended, had been altered in material particulars after its execution. That the alterations charged, changed the legal effect of the instrument, is not open to question. If the word "fifteen" was written over "forty" after the instrument was executed, then the original pledge was $240,000, or 24,000 shares, of stock; and the alteration of this into $215,000, which would be 21,500 shares,—a deduction of 2,500 shares, —would make it appear that 2,500 of the 10,000 shares purchased by the plaintiff, instead of being issued to him directly by the company upon the order of Underwood, as alleged on the other side, were part of the 24,000 shares, and were not deposited in pledge, but were his absolute property. If, in this particular, the note was originally as Underwood now states it was, his memory was in a confused condition respecting it when his answer was drawn, and Mrs. Underwood must have relied on the allegations of his answer, when she

made hers. According to the statements of his attorneys, his recollection on the subject then, coincided with his knowledge subsequently acquired, but it was not sufficiently well defined to prevent him from being persuaded by them that he was mistaken. If such was in fact the case, it would furnish a satisfactory explanation of the statements of his answer, and also of that of Mrs. Underwood, concerning the number of shares pledged. The appearance of the note caused by writing one word over the other in such manner that it is difficult to decipher either, would seem to call with considerable emphasis for an explanation, but none was ventured by the plaintiff. If the words, "if recourse is had to the said collaterals," were originally in the contract, their erasure would make an important change in the conditions upon which the stock was pledged. With them in, the stock was held as security only for the $28,000, unless an enforcement of the pledge should become necessary, in which case any surplus realized from the sale might be applied to the payment of other indebtedness from Underwood to the plaintiff; while with them out, the stock was held for all claims of the plaintiff against Underwood, whether it should become necessary to resort to it for the payment of the $28,000 note or not.

The alteration of a written instrument in a material part, by the person claiming under it, avoids the instrument; and no cause of action can be predicated upon it, either in its original or its altered form. Bigelow on Fraud (ed. of 1877), p. 98, *et seq.* No relief was sought by the plaintiff except against the Tom Boy Company. The proceeding is in equity, and Underwood was made a party, only because he was one of the officers of the company charged with a duty, the refusal to perform which, is the subject of the complaint. In his answer he disclaimed title to the stock, or interest in the subject-matter of the action. Neither himself, nor his property, could be affected by any judgment which might be rendered, and, as he showed himself to be without interest, we are unable to say that the refusal to permit him to amend,

would, of itself, warrant a reversal. In a suit against him on the note he could answer its alteration, but nothing is involved in this proceeding except the title to stock. As to the Tom Boy Company, however, the situation is different. Judgment was sought against it, and whatever would constitute a defense to the action, or exonerate it from liability to the plaintiff, it had the right to avail itself of. It is true that the allowance of the amendment asked was within the discretion of the court. But the discretion with which courts are clothed in such matters, is not an arbitrary discretion. It is a discretion to be exercised soundly, and in the interests of justice. That this instrument, in its present form, if altered as alleged, should be received as a verity, would not be in the interests of justice. The company was chargeable with no lack of diligence in making the application, and we think the refusal to permit the amendment was not the exercise of a sound discretion. Mrs. Underwood was out of the case before the discovery of the alteration, if there was one. Upon her statements she is directly and vitally interested in the disposition which shall be made of the stock. As a claimant of the stock, she also would have the right to interpose in her own behalf every fact which would tend to defeat the claim of the plaintiff. Of course the statements in her pleadings may turn out to be unfounded, and so may the charge of alteration; but it cannot be determined whether they are or not, without evidence. Matters are alleged materially affecting the cause of action as the plaintiff has stated it, and their truth, as well as the truth of his statements, should be inquired into.

The judgment is reversed and remanded for further proceedings in conformity with this opinion.

*Reversed.*